**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
UNITED STATES OF AMERICA,

               -against-                          **MEMORANDUM OF**
                                                       **DECISION AND ORDER**

NAT SCHLESINGER, also known as "Naftule      Cr. No. 02-485 (ADS) (ARL)
Schlesinger" and "Zvi Pollack," HERMAN
NIEDERMAN, and GOODMARK
INDUSTRIES, INC.,

                       Defendants.
--------------------------------------------------------X

**APPEARANCES:**

**ROSLYNN R. MAUSKOPF**
**UNITED STATES ATTORNEY**
**EASTERN DISTRICT OF NEW YORK**
610 Federal Plaza
Central Islip, New York 11722-4454
        By:     Lawrence Philip Ferazani,
                  Cynthia M. Monaco
                  Richard Lunger, Assistant U.S. Attorneys

**SHAW LICITRA GULOTTA ESERNIO & SCHWARTZ, P.C.**
Co-counsel for the defendants Nat Schlesinger and Goodmark Industries, Inc.
1475 Franklin Avenue
Garden City, NY 11530
        By:     Douglas T. Burns, Esq., Of Counsel

**RANDY SCOTT ZELIN, P.C.**
Co-counsel for the defendants Nat Schlesinger and Goodmark Industries, Inc.
675 Old Country Road
Westbury, NY 11590
        By:     Randy Scott Zelin, Esq., Of Counsel

**LIPSITZ, GREEN, FAHRINGER, ROLL, SALISBURY & CAMBRIA, LLP**
Co-counsel for the defendants Nat Schlesinger and Goodmark Industries, Inc.
780 Third Avenue, 32nd Floor
New York, NY 10017
By:      Herald Price Fahringer, Esq., Of Counsel

**SPATT, District Judge.**

This criminal prosecution initially arose out of a series of fires that occurred from 1987 to 1999 at a clothing factory in the Williamsburg section of Brooklyn, New York. The factory was once a place where women's clothing was manufactured for sale to high end retailers such as Neiman-Marcus, Saks Fifth Avenue, and Bloomingdales. On New Year's Eve 1998, the factory was the scene of a suspicious fire in which a firefighter temporarily became lost deep inside the factory while battling the blaze. The investigation that followed resulted in a thirty-four count indictment against one of the owners of the business that occupied the factory on charges of arson, conspiracy, insurance fraud, creditor fraud, and money laundering.

On May 19, 2005, after a four week jury trial, the defendant Nat Schlesinger ("Schlesinger" or the "Defendant") was convicted of one count of arson and one count of use of fire to commit a felony in connection with the December 31, 1998 fire (the "1998 New Year's Eve Fire"). In addition, Schlesinger was convicted of one count of conspiracy to commit mail and wire fraud with regard to insurance claims, thirteen counts of mail fraud, and two counts of wire fraud on the insurance claims, and one count of conspiracy to

engage in monetary transactions with insurance fraud proceeds in connection with the scheme to fraudulently inflate insurance claims on the losses suffered as a result of the 1998 New Year's Eve fire and four other fires that occurred at the factory. This fraudulent scheme was carried out by the Defendant through the use of bribes and false documents involving fires spanning a period from 1991 to 1999.

Schlesinger was also convicted of one count of conspiracy, four counts of mail fraud, and three counts of engaging in monetary transactions with fraudulent proceeds resulting from a second scheme to defraud the creditors of the clothing manufacturing businesses that he controlled. This scheme involved the use of nominees and shell corporations to carry out what was, in effect, two self organized bankruptcies. The Defendant, who with his brother Jack Schlesinger, owned and controlled both companies involved, was able to transfer the assets and operations of a financially unstable company to an ostensibly new company. As a result, on two occasions the creditors of the businesses were deprived of their machinery and equipment collateral and left with judgment proof debtors.

At the conclusion of the trial the Defendant moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure on the counts of arson and use of fire to commit a felony. The Defendant contended that there was insufficient evidence at trial to support a conviction of arson and that the jury was improperly influenced by the

evidence presented concerning the other counts. The Defendant also argued that an out of court statement allegedly related to the fire should have been excluded by the Court as inadmissible hearsay. At the conclusion of the Government's case, at the end of the entire case, and after the verdict the Court reserved decision on these Rule 29 motions. For the reasons set forth below, the motion is denied.

## I.     Background

Along with his brother Jack, the Defendant Nat Schlesinger owned and operated a place of business in the Williamsburg section of Brooklyn in a building that occupied an entire city block bordered by Wallabout Street, Kent Avenue, and Classon Avenue. The place of business was identified at various times as: (1) 48-76 Wallabout Street, Brooklyn, New York; (2) 50 Wallabout Street, Brooklyn, New York; (3) 750 Kent Avenue, Brooklyn, New York; and (4) 1 Classon Avenue, Brooklyn, New York ("the Premises"). The two brothers operated a clothing manufacturing company at this location beginning in the 1980's under the names Pous Apparel, Inc., Private Brands of Delaware, Inc., and Goodmark Industries, Inc. At the time of the 1998 New Year's Eve Fire, the business was operating under the name Goodmark Industries, Inc.

The Premises was designed and equipped as a knit clothing factory. The three story building contained all the processes necessary to design and manufacture women's clothing. The first floor contained storage for the yarn as well as knitting, slicing, and framing

machines. The second floor housed sewing and dying machines to wash, dye, and cut the fabric. The second floor also contained a design room and an office. That office was primarily occupied by Nat and Jack Schlesinger. The third floor was the shipping area where the clothes were stored, boxed, and eventually shipped out to the customers. The clothes were stored on the third floor by hanging them in aisles of racks or by storing them in boxes.

On Thursday, December 31, 1998, at about 10:30 p.m., a fire broke out in the third floor shipping area. On that day the factory had closed at 5:00 pm for the New Year's Eve holiday. Normally the factory operated twenty four hours a day, six days a week, and was only closed on Friday nights and Saturdays for religious reasons. At the trial, the following witnesses testified concerning the events leading up to the fire: (1) Jack Schlesinger's son-in-law Israel Schwimmer, (2) the manager of the third floor shipping department Abraham Weiser, and (3) Jack Schlesinger's son Victor Schlesinger.

Israel Schwimmer worked at Goodmark for several years. Schwimmer testified that on the day of or a day prior to the 1998 New Year's Eve fire he observed the Defendant and his son David removing about four or five bags of papers from the Defendant's file cabinets. Schwimmer testified that before he left on the day of the fire he stopped in to see Jack Schlesinger in the main office. While in the office he overheard a conversation between Abraham Weiser and the Defendant. Weiser told the defendant that he was going to lock

up the third floor for the day.  The Defendant told Weiser that he would take care of locking

up the third floor that day.  Israel Schwimmer left the building at about 5:00 pm that day and

Jack and Nat Schlesinger remained at the factory in the second floor office.

Abraham Weiser had worked for the Defendant for approximately twelve years until

the clothing business closed in 2000.  At the time of the fire, Abraham Weiser was the

supervisor of the shipping department located on the third floor.  He was responsible for

packing the manufactured garments in boxes to send by UPS or in bags via their own truck.

Weiser testified that no other employees worked with him in the shipping area in December

1998.  One of his responsibilities was to secure the two entrances to the third-floor shipping

area and turn off the lights by closing the circuit breaker each night before he left.  In fact,

Abrahm Weiser testified that it was his practice to secure both doors and turn off the circuit

breaker at the end of the day and that the only other people with keys to that floor were

Jack and Nat Schlesinger.  However, Abraham Weiser did not have keys to the exterior

entrances of the factory.

Weiser testified that on December 31, 1998, he was the only person on the third

floor during the day.  He testified that he did not smoke; that smoking was not permitted in

the building; and he did not observe anyone smoking on the third floor on the day of the fire.

Weiser stated that he "wouldn't let them smoke" because he "can't take the smoke."  Tr. at

616.  Weiser further testified that there were no flammable liquids, thinners, dyes, linseed

oils or the smell of smoke or any other unusual odor before he left on December 31, 1998.

Weiser stated that occasionally a small cleaning gun was used on the third floor to remove

stains from the finished garments. Weiser testified that on December 31, 1998, at about

4:00 p.m., he locked up the third floor and turned off the circuit breaker providing electricity

to the third floor, locked both doors, and left the building.

Victor Schlesinger testified that he had maintained an office in the Premises on the

second floor. Victor stated that he would typically visit the factory and his father Jack daily

at the end of the day. He stated that he did not have keys to the factory but that the security

guard would let him in. On the day of the fire, Victor went to his father's office and found

his father with Nat. While in the office, Victor told his father that he wanted to come back

to the building later that evening to get some work done. The Defendant overheard this

request and told Victor, "No, you are not coming back here." Tr. 1490. In response, Jack

told Victor that he should listen to Nat and not return to the building. While this

conversation was occurring, Victor observed Abraham Weiser enter the office and tell the

Defendant and Jack that he was closing up the third floor. Victor testified that the

Defendant told Weiser, "No, don't close up the third floor, I'm going to close it." Tr. 1491.

At about 10:30 pm on December 31, 1998, the New York City Fire Department

received reports of a fire at the Premises. Several fire companies were dispatched and

confirmed that there was visible fire coming from the third floor of the factory. All of the

entrances to the Premises were locked and secure when the fire department arrived. The fire department forced entry into the factory and ascended the stairs to the third floor. At the top of the stairs they found that the entrance to the third floor was also locked and had to break down that door. Inside the third floor there was a smokey fire that was difficult to find. One of the firefighters became lost while searching for the fire and sent out a "mayday." The firefighter was quickly rescued and was unharmed by the incident.

The fire was eventually found to be located underneath a mezzanine that was constructed above the third floor. Under the mezzanine, clothes were hung from rows of racks. Above the mezzanine boxed goods were stored. Firefighters testified that in order to extinguish the fire they had to proceed through each of the rows of clothes under the mezzanine. Part of the mezzanine eventually collapsed due to the fire. The investigation that followed revealed that the main body of fire was located under the mezzanine and that the boxes stored above the mezzanine were not charred as much as the goods stored below.

The New York City Fire Marshal was requested to go to the scene the night of the fire, but was unable to respond until the following Monday due to the New Year's holiday. On Monday, January 4, 1999, the Fire Marshal conducted a quick investigation and determined the cause of the fire to be "not ascertained." The Fire Marshal explained that due to lack of resources the investigator was unable to search under the partially collapsed

mezzanine, and thus labeled the location of the fire as the third floor, origin unknown.  After

the Fire Marshal left the owners were allowed back inside the factory.

Israel Schwimmer and Victor Schlesinger both testified with regard to the events

that took place the Monday following the fire, which was the first day the owners were

allowed back into the factory.  Israel Schwimmer testified that he went to the main office

where he saw the defendant with Jack Schlesinger, Milton Jacobi, Abraham Weiser, and the

Defendant's son, Sam Schlesinger.  There Schwimmer overheard a conversation between

Nat Schlesinger and his son Sam Schlesinger, who was an insurance claims adjuster.  The

Defendant told him to "put together a nice claim" and to "put everything, new fabric, old

fabric, whatever he could put in the claim."  Tr. at 508–09.  Schwimmer also recalled a

conversation between the Defendant and his son David.  This testimony was admitted

without objection:

> Q      And what was that conversation?
>
> A      A week after the fire they were discussing the fire, the fire was good.
>        A job well done.
>
> Q      Who said a job well done?
>
> A      David.
>
> Q      Who did he say that to?
>
> A      His father, Nat.

Q      What did the defendant, Nat Schlesinger, say in response?

A      We will wait for the claim that is going to go through.

Q      Where were you when they were having this conversation?

A      I was in the hallway out of the office.

Q      Where was the defendant and his son, David Schlesinger?

A      In the office.

Tr. at 510.

Victor Schlesinger testified that he observed substantial damage in the building and described it as a "whole mess." Tr. 507, 1493. When Victor went to see his father Jack in the second floor office that day, he found him with the Defendant. The Defendant was telling Jack Schlesinger to go slow in starting up the business because adjusters needed to come down and assess the damage. While they were in the office, the Defendant's son David Schlesinger entered the room and stated "job well done." Tr. 1500. Victor testified that the statement was made with bravado as a "happy thing," despite the fact that he was standing in the midst of the damage resulting from the fire. The Court notes that the testimony was erroneously transcribed as "bragado [sic], happy things," instead of "bravado." Tr. at 1500.

Israel Schwimmer also testified that he was in the second floor office when David Schlesinger entered proclaiming "a job well done." Tr. 510. Schwimmer testified that the

Defendant replied to that statement by saying, "[w]e will wait for the claim that is going to go through." Tr. 510.

Testimony and evidence was offered by the Government showing that the Defendant submitted a fraudulent insurance claim to Atlantic Mutual Insurance Co. ("Atlantic Mutual"), with regard to the 1998 New Year's Eve Fire. David Steinberg, a self-employed sewing machine repairman, testified that in January 1999 he assessed the damage to the machines at Goodmark Industries. Steinberg stated that he either merely applied a coat of oil to the machines or advised Schlesinger to do the same. For these services, Steinberg faxed an estimate for $58,000 to the Defendant. After the first estimate, the Defendant or his brother called Steinberg and asked for a second estimate. The second estimate was for $85,860, even though Steinberg stated that he never did any work on the machines. In addition, the insurance claim that the Defendant submitted contained a fraudulent estimate from a company known as G.I.I. Engineering. This was a fictitious company created by the Defendant.

Atlantic Mutual hired Thomas J. Russo, a cause and origin expert, to investigate and ascertain the origin and cause of the 1998 New Year's Eve Fire. Russo determined that the fire began in the shipping area on the third floor and that the entire building was secured when the fire department arrived. In order to assist his investigation, Russo hired James Pryor, an electrical engineer, to review the electrical system in the area of origin. The

electrical engineer testified that he determined that there were no electrical faults which could have caused the fire. Pryor testified that he inspected the circuit breaker panel which provided service to the area of the fire, as well as the wiring and lighting in the area of the fire. Pryor ruled out electrical causes for this fire. Russo's on site inspection also revealed that there were no appliances, candles, machinery, chemicals, smoking material, or heating units in the area of origin.

Russo also conducted witness interviews of Abraham Weiser and Jack Schlesinger. Weiser told him that he personally did not smoke and he did not observe anyone smoking on the third floor on December 31, 1998. He stated there were no candles, incense, oily rags, or cleaning agents in the area. Weiser stated that he did not notice anything unusual prior to departing and securing the area.

Jack Schlesinger told Russo that a delivery man may have been on the third floor around 11:00 a.m. on December 31, 1998. He also stated that he, the Defendant, and one other person were the only people with keys to the entire building.

As a result of his investigation, Russo concluded that the fire was intentionally set. Russo arrived at this conclusion by excluding all electrical and accidental causes. He was able to exclude cigarette smoking as a possible source of ignition for the following reasons: (1) there was no evidence that personnel smoked on the third floor; (2) there was no evidence of cigarettes on the third floor; and (3) the time between the last person exiting the

building and the report of the fire was too long to support the inference that a kindling

cigarette could have started the fire.  Tr. 709.  Russo also excluded an act of God after

research indicated that there were no earthquakes or thunderstorms.  Russo further

excluded the possibility that the roof mounted heater caused the fire upon examination of the

unit, which showed no evidence of flame impingement or any other heat source coming from

the unit.  After excluding all accidental causes, Russo concluded that the December 31,

1998 fire was intentionally set.

New York City Fire Marshal Bernard Santangelo testified that in March 1999 he

opened an investigation into the 1998 New Year's Eve Fire.  After commencing the

investigation he attempted to interview the Defendant.  Fire Marshal Santangelo stated that

the Defendant repeatedly changed the date of the interview and delayed his appointment on

several occasions.  When the Defendant finally met with Fire Marshal Santangelo, the

Defendant tape recorded the meeting without Fire Marshal Santangelo's knowledge.  In the

interview, Schlesinger told Fire Marshal Santangelo that he was the "Manager of financial

operations" and held no official position in the company or on the board of directors.  The

Defendant also refused to answer several questions and seemed irritated.  The Defendant

responded to several questions by asking questions back such as "who are you?"  The

Defendant told Fire Marshal Santangelo that he had a complete set of keys to the building

and left the building around 6 or 7 p.m. the night of the fire.  When asked about the claim

history of the building, the Defendant stated that he could only recall one other fire which occurred in 1991 when the factory was operating as Private Brands. The Defendant denied any involvement in Private Brands.

Fire Marshal Santangelo's investigation also considered the fraudulent estimate of repair drafted by the fictitious company G.I.I. Engineering. He also included the Russo report and the report from James Pryor the electrical expert. Fire Marshal Santangelo interviewed the firefighters that responded to the scene as well as witnesses who were at the Defendant's building, including Abraham Weiser, Victor Schlesinger, and Israel Schwimmer.

Fire Marshal Santangelo also testified that on August 3, 1999, another fire broke out at the building. This fire was also later determined to be an arson because it had four distinct and separate points of origin.

Based upon all the interviews, reports, photographs, and his investigation, Fire Marshal Santangelo also concluded that the 1998 New Year's Eve Fire was an incendiary fire ignited by the intentional application of an open flame. Fire Marshal Santangelo also concluded that the only persons who had keys to the entire building on that night were Jack and Nat Schlesinger and that the buildings were secure upon arrival of the fire department. Retired New York City Fire Department Lieutenant Peter Casey testified that upon their arrival all doors to the building were locked, and that with great difficulty they forced open the doors.

The Defendant presented evidence of a bitter family dispute between him and the survivors of his brother Jack, who passed away in 2001, including Jack's son Victor Schlesinger. The Defendant recalled Abraham Weiser to the stand to refute the allegations made by Victor Schlesinger and Israel Schwimmer. Weiser testified that Nat Schlesinger never told him not to lock the third floor the night of the fire, in fact, he did not even speak to him before he left. In addition, he stated that Victor Schlesinger had an office in the building at one point in time but in December 1998 that office had been converted into another office. Weiser also testified that the guard that Victor stated had let him in at night when the factory was locked had died in 1995 and that no replacement was ever hired. Weiser also stated that in addition to finished garments there were many old religious books that the Defendant had stored on the third floor. Further, he stated that he approached some of the witnesses that testified at the trial about lying on the stand and "they just say they want to fix Nat." Tr. at 2451, 2458.

After three days of deliberation, the jury returned a verdict of guilty on thirty of thirty-one counts, including both arson-related counts. After the trial, the Defendant moved pursuant to Fed. R. Crim. Proc. 29 for a judgment of acquittal arguing that the verdict was based upon mere speculation and surmise. The Defendant further moved to strike, as inadmissable hearsay, the testimony of Victor Schlesinger as to the statement "job well done" made by David Schlesinger in the days following the fire. The Defendant also

contends that notwithstanding the admissiblity of that statement, there was no proof that the

Defendant aided, abetted, or participated in setting the 1998 New Year's Eve Fire.

## II.    DISCUSSION

### A.    The Standard of Review

The standard of review on a motion for judgment of acquittal is well-settled.  In the

Second Circuit it has been repeatedly stated that a defendant challenging a conviction on the

basis of insufficient evidence bears a heavy burden.  United States v. Thomas, 377 F.3d

232, 237 (2d Cir. 2004); United States v. Tocco, 135 F.3d 116, 123 (2d Cir. 1998);

United States v. Russo, 74 F.3d 1383, 1395 (2d Cir. 1996).  This is because the evidence

must be viewed in the light most favorable to the government and all permissible inferences

must be drawn in its favor.  See United States v. Hernandez, 85 F.3d 1023, 1030 (2d Cir.

1996); see also United States v. Casamento, 887 F.2d 1141, 1156 (2d Cir. 1989).  The

court also must defer to the jury's resolution of witness credibility and, where there is

conflicting testimony, to its selection between competing inferences.  Tocco, 135 F.3d at

123; see also United States v. Pelaes, 790 F.2d 254, 259 (2d Cir.1986).  A conviction

must be sustained if "any rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct.

2781, 2789, 61 L. Ed.2d 560 (1979); United States v. Desimone, 119 F.3d 217, 223 (2d

Cir. 1997).  Further, the elements of the crimes charged may be proved entirely by

circumstantial evidence. <u>See</u> <u>United States v. Sureff</u>, 15 F.3d 225, 228 (2d Cir. 1994).

Also, the court must consider the evidence in its totality, and not in isolation. <u>United States</u>

<u>v. Rosenthal</u>, 9 F.3d 1016, 1024 (2d Cir. 1993).

"The court must be careful to avoid usurping the role of the jury." <u>United States v.</u>

<u>Guadagna</u>, 183 F.3d 122, 129 (2d Cir. 1999). "If the court concludes that either of the two

results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the

jury decide the matter." <u>United States v. Autuori</u>, 212 F.3d 105, 114 (2d Cir. 2000). With

these principles in mind, the Court must uphold the jury's verdict if it finds that "any rational

trier of fact could have found the essential elements of the crime beyond a reasonable

doubt." <u>Jackson</u>, 443 U.S. at 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560.

### B.      The Evidentiary Issue

The Defendant argues that the statement "job well done" made by the Defendant's

son after observing the fire for the first time is inadmissible hearsay. "Hearsay is evidence of

a declarant's out-of-court statement to prove the truth of what is asserted in the statement."

<u>United States v. Forrester</u>, 60 F.3d 52, 59 (2d Cir. 1995) (quoting <u>United States v. Reyes</u>,

18 F.3d 65, 69 (2d Cir. 1994)); Fed R. Evid. 801(c). As a general rule, hearsay is

inadmissible unless an exception applies. Thus, the threshold question in this case is whether

the statement at issue is hearsay, and if so, whether an exception applies.

A statement is not hearsay, under Fed. R. Evid. 801(d)(2)(E), if "[t]he statement is offered against a party and is . . . a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Id. "In order to admit out-of-court statements pursuant to Rule 801(d)(2)(E), the trial court must find that the government has established by a preponderance of the evidence that there was a conspiracy, that both the declarant and the party against whom the statements are offered were members of the conspiracy, and that the statements were made in furtherance of the conspiracy." United States v. Daly, 842 F.2d 1380, 1386 (2d Cir. 1988); see also United States v. Alameh, 341 F.3d 167, 176 (2d Cir. 2003); United States v. Maldonado-Rivera, 922 F.2d 934, 958 (2d Cir. 1990). In making this determination, the court may take into account the proffered out-of-court statement if that statement is sufficiently reliable in light of the evidence. Bourjaily v. United States, 483 U.S. 171, 107 S. Ct. 2775, 2781–82, 97 L. Ed. 2d 144 (1987).

In 1997, following the Supreme Court's decision in Bourjaily concerning co-conspirator statements, Fed. R. Evid 801(d)(2)(E) was amended to clarify whether the declarant's statement alone can be sufficient to establish a conspiracy between the declarant and the defendant. The rule as amended states that "[t]he contents of the statement shall be considered but are not alone sufficient to establish the declarant's authority . . . or the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered . . . ." Fed. R. Evid. 801(D)(2). The advisory

18

committee noted that a court must consider the circumstances surrounding the statement, in addition to the proffered statement, when making its evidentiary determination. The circumstances may include factors "such as the identity of the speaker, the context in which the statement was made, or evidence corroborating the contents of the statement." Fed. R. Evid. R 801 advisory committee's note (1997 Amendment) (citing Daly, 842 F.2d at 1386)).

The clarification in the amendment is clearly set forth in the authoritative text, Weissenberger's Federal Evidence:

> Under the amended Rule, a court can consider the contents of a conspirator's statement in making the preliminary determination as to whether a conspiracy exists between the declarant and the party against whom the statement is offered. This amendment thus reflects the holding of the Supreme Court in Bourjaily. However, the amendment also clarifies [that] the statement "are not alone sufficient" to establish the conspiracy. The trial court should consider circumstances surrounding the statement, such as the identity of the speaker and evidence corroborating the contents of the statement, in addition to the contents of the statement itself, in determining whether the proponent has proven the existence of a conspiracy by a preponderance of the evidence, as required under Rule 104(a).

Glen Weissenberger & James J. Duane, Weissenberger's Federal Evidence § 801.21 (4th ed. 2001).

With these principles in mind, in order to admit the statement "job well done," the Court must find by a preponderance of the evidence: (1) that a conspiracy existed that included the defendant and the declarant; (2) that the statement was made during the course

of and in furtherance of that conspiracy; and (3) that there is some independent corroborating evidence of the defendant's participation in the conspiracy. <u>United States v. Desena</u>, 260 F.3d 150, 157–58 (2d Cir. 2001). "The conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment." <u>United States v. Gigante</u>, 166 F.3d 75, 82 (2d Cir. 1999).

For a statement to be "in furtherance of the conspiracy," it must be more than a mere "narrative description by one co-conspirator of the acts of another." <u>United States v. SKW Metals & Alloys, Inc.</u>, 195 F.3d 83, 88 (2d Cir. 1999) (citations and quotation marks omitted). "Statements in furtherance of a conspiracy 'prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity.' " <u>Desena</u>, 260 F.3d at 157–58 (quoting <u>Maldonado-Rivera</u>, 922 F.2d at 958). "[T]he statements need not be commands, but are admissible if they 'provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or <u>inform each other as to the progress or status of the conspiracy</u>.' " <u>SKW Metals & Alloys, Inc.</u>, 195 F.3d at 88 (quoting <u>Maldonado-Rivera</u>, 922 F.2d at 959) (emphasis added).

Here, the Court finds that a conspiracy to commit arson and submit a fraudulent insurance claim existed between the Defendant and his son David Schlesinger by a preponderance of the evidence. The statement "job well done" was made by a close family member—the Defendant's son David Schlesinger—shortly after observing the damage the

factory sustained after the fire.  Israel Schwimmer corroborated the utterance of the

statement and testified that the Defendant responded by saying "[w]e will wait for the claim

that is going to go through."  Although Schwimmer testified that the statement was made "a

week after the fire," the statement and location where it was overheard are identical to the

testimony of Victor Schlesinger so as to find it corroborating.  In addition, the statement

appears to have been made in furtherance of the conspiracy in that it "inform[ed] [the

Defendant] as to the progress or status of the conspiracy."  <u>SKW Metals & Alloys, Inc.</u>,

195 F.3d at 88.  His evident happiness standing in a place of destruction after the fire is

revealing, apparently declaring the successful culmination of the subject of the conspiracy.

As such, the Court finds, by a preponderance of the evidence, that the statement "job well

done" along with the circumstances in which it was made satisfy the requirements to be

admitted into evidence under Rule 801(d)(2)(E).

In addition, the Court finds that the statement "job well done" was admissible under

Fed. R. Evid. 803(1) as a present sense impression exception to the hearsay rule.

According to the Rule, a present sense impression is a statement "describing or explaining an

event or condition made while the declarant was perceiving the event or condition, or

immediately thereafter."  Fed. R. Evid. 803(1).  "Rule 803(1) provides a vehicle for the

admission of out-of-court statements concerning an event or condition where the statement

describes or explains the event."  Weissenberger's Federal Evidence § 803.1.  In this case,

clearly the words "job well done" both described and explained—in a happy vein—the destruction caused by the fire. "Such statements are considered to be trustworthy because the [contemporaneous report] of the event and its description limits the possibility for intentional deception or failure of memory." United States v. Jones, 299 F.3d 103, 112 (2d Cir. 2002) (citing United States v. Brewer, 36 F.3d 266, 272 (2d Cir. 1994)); see, e.g., United States v. Dolan, 120 F.3d 856, 869 (8th Cir. 1997) (upholding the admission of a statement under the present sense impression in which the declarant stated that he "had [the defendant] by the balls" shortly after having met with the Defendant).

Here, the Government has established the following facts by a preponderance of the evidence: (1) that David Schlesinger observed firsthand the condition of the factory as he made his way to the second floor, (2) that the statement was made immediately after he observed the condition of the factory, (3) that the statement described what he observed firsthand through his senses, and (4) that he was also describing the successful culmination of the subject of the conspiracy. See, e.g., Brown v. Keane, 355 F.3d 82, 89 (2d Cir. 2004). As such the statement is admissible under the present sense impression exception to the hearsay rule.

### C. The Arson Conviction

In this case, Schlesinger was convicted of one count of arson under 18 U.S.C. §
844(i) and one count of use of fire to commit a felony under 18 U.S.C. § 844(h)(1). Arson
is prohibited under the terms of 18 U.S.C. § 844(i), which states in pertinent part:

> Whoever maliciously damages or destroys, or attempts to damage or destroy,
> by means of fire or an explosive, any building, vehicle, or other real or personal
> property used in interstate or foreign commerce or in any activity affecting
> interstate or foreign commerce shall be imprisoned for not less than 5 years and
> not more than 20 years, fined under this title, or both.

18 U.S.C.A. § 844

Congress originally enacted 18 U.S.C. § 844(i) as part of Title XI of the Organized
Crime Control Act of 1970, Pub. L. 91-452, § 1102, 84 Stat. 952, "because of the need to
curb the use, transportation, and possession of explosives." Russell v. United States, 471
U.S. 858, 860, n. 5, 105 S. Ct. 2455, 85 L. Ed.2d 829 (1985) (citation omitted). The
word "fire," which was not originally included in § 844(i), was introduced by statutory
amendment in 1982. See Jones v. United States, 529 U.S. 848, 852–53, 120 S. Ct.
1904, 1909 (2000). In its current form, § 844(i) provides for the punishment of anyone
who attempts to damage or destroy any building used in interstate commerce by means of
fire. United States v. Joyner, 201 F.3d 61, 78 (2d Cir. 2000).

To maintain a prosecution under 18 U.S.C. § 844(i), the government must prove
that the defendant: (1) maliciously; (2) damages or destroys, or attempts to damage or
destroy a building; (3) by means of fire or explosive; and (4) the building is used in interstate

or foreign commerce or in any activity affecting interstate or foreign commerce.  See United States v. Gullett, 75 F.3d 941, 947 (4th Cir. 1996); United States v. Nguyen, 28 F.3d 477, 480–81 (5th Cir. 1994); United States v. Triplett, 922 F.2d 1174, 1177 (5th Cir. 1991).

The element of "malice," "is satisfied if the defendant acted intentionally or with willful disregard of the likelihood that damage or injury would result from his or her acts." Gullett, 75 F.3d at 948.  In addition, the government must show that the arson in question destroyed or damaged property either 'used in' or 'used in any activity affecting' interstate commerce."  Joyner, 201 F.3d 61, 78 (quoting Tocco, 135 F.3d at 124).

Under the provisions of 18 U.S.C. § 844(h)(1), a person who uses fire or explosives to commit a felony, such as mail or wire fraud, is subject to an additional mandatory, and consecutive, sentence of five to fifteen years.  Id.; United States v. Marji, 158 F.3d 60, 64 (2d Cir. 1998).  To sustain a conviction under § 844(h)(1), the government must prove that the defendant (1) used fire (2) to commit a "felony which may be prosecuted in a court of the United States." 18 U.S.C. § 844(h)(1).  In order to find the evidence sufficient for a conviction under section 844(h)(1), the underlying felony as well as the arson must be analyzed for sufficiency.  However, since this motion attacks only the arson and not the other convictions, the only question the Court faces at this juncture is whether the evidence is sufficient to establish that Schlesinger committed or aided and abetted the commission of arson under § 844(i).  See, e.g., Nguyen, 28 F.3d at 481.

Accordingly, the § 844(h)(1) conviction for use of fire to commit a felony will stand or fall with the arson count.

In United States v. Yoakam, 116 F. 3d 1346, 1350 (10th Cir. 1997), the United States Court of Appeals for the Tenth Circuit reversed a conviction for arson on the basis of insufficient evidence. In that case the government sought to prosecute the twenty-five percent shareholder of a supply company after the business was suspiciously burned to the ground. The fire broke out on the same night that the defendant was to finalize an agreement to purchase the remainder of the company from the other shareholders. The defendant was the last person to leave the business that night. Three fire experts testified that the cause of the fire was arson. However, the court found that there was insufficient evidence linking the arson to the defendant. In particular, the court noted that there was no evidence to support the government's theory that the defendant was motivated to commit arson by pressure to enter into an unfavorable business arrangement. Id. The only evidence that the court found that linked the defendant to the fire was that he was the last person to leave the building before the fire broke out. The court held, "In our view, mere presence cannot establish beyond a reasonable doubt that [the defendant] committed the arson." Id.

In this case the cumulative circumstantial evidence the Government presented at trial was sufficient for a reasonable juror to conclude, beyond a reasonable doubt, that the Defendant Schlesinger committed both arson and use of fire to commit a felony. Unlike the

<u>Yoakam</u> case, here there is more evidence than mere presence. Despite the lack of direct evidence, the Court finds that the totality of the circumstantial evidence is sufficient to sustain the verdict. Crimes may be proven entirely by circumstantial evidence, so long as the jury could fairly have found beyond a reasonable doubt that the defendant engaged in the charged criminal conduct. <u>See</u> <u>United States v. Sureff</u>, 15 F.3d 225, 228 (2d Cir. 1994) (observing that a prosecution for murder may succeed without a body or other evidence of the means of death). Here, the circumstantial evidence the Government offered tended to show that Schlesinger had the motive, means, and opportunity to commit the crime, as well as consciousness of guilt.

There was ample evidence that the fire was intentionally set. The Government presented both the cause and origin expert and the New York City Fire Marshal that investigated the fire. Both investigators concluded after separate independent investigations that the fire was intentionally set and that the building was locked tight when the firefighters arrived. The time, location, and the absence of accidental or natural sources of ignition for the fire provided ample evidence that it was incendiary, even though there was no direct evidence that an accelerant was used to ignite the fire.

There was also testimony sufficient to permit a reasonable juror to infer that the Defendant had prior knowledge of the contemplated arson. Israel Schwimmer observed the Defendant and his son removing four or five bags of papers from the Defendant's files in the

second floor office the day of or the day prior to the fire.  In addition, Schwimmer testified that the Defendant told Abraham Weiser not to lock the third floor that night.  Further, Victor Schlesinger testified that he was instructed by the Defendant not to return to the building that night.

The evidence showed that the Defendant had an opportunity and a means to commit the crime.  The Defendant was the last person to leave the factory that night.  After a thorough investigation, Fire Marshal Santangelo concluded that the Defendant and his brother Jack were the only two individuals who had access to the outside entrances and the third floor.  Undisputed testimony from Fire Marshal Santangelo and the firefighters at the fire scene established that all of the outside entrances as well as the entrance to the third floor shipping area were locked upon arrival of the first fire companies.  There was no evidence that a perpetrator broke into the factory or could have gained entry through the locked doors.  Based on this evidence, a reasonable juror could conclude, beyond a reasonable doubt, that the Defendant was one of only two people who had the access to start the fire in the third floor of the tightly locked factory.

Also, there was evidence adduced that the Defendant had a motive to commit the crime.  After the fire the Defendant told his son Sam Schlesinger to put together a "nice claim" that included all the old and new fabric.  The fire had been confined to the third floor where there was no valuable machinery to damage.  The Defendant submitted two

fraudulent estimates in the insurance claim made to Atlantic Mutual with regard to machines that were never damaged.  In addition, the Defendant told his brother Jack to take it slow in restarting the business because insurance adjusters needed to come and evaluate the damage.  All of this evidence demonstrates a motive to commit arson and to steal money from the insurance company.

Testimony from both Israel Schwimmer and Victor Schlesinger showed that the Defendant impliedly acknowledged the criminal act and substantiated the motive for the arson.  On the first day that the Defendant and his employees were able to return to the factory, two witnesses overheard the Defendants son David exclaim "job well done." Schwimmer testified that the Defendant replied, "[w]e will wait for the claim that is going to go through."  This exchange was described as joyful and occurred shortly after the fire and while the declarants were under an area of extensive damage.  A reasonable juror could conclude from these statements, beyond a reasonable doubt, that the Defendant had knowledge and involvement in aiding and abetting or causing the fire.

Finally, there was evidence that the Defendant conducted himself in such a manner after the fire so that a reasonable juror could infer a consciousness of guilt.  The Second Circuit has held that a jury may infer consciousness of guilt from, for example, evidence of flight after a crime.  See United States v. Salameh, 152 F.3d 88, 157 (2d Cir. 1998); United States v. Sanchez, 790 F.2d 245, 252 (2d Cir. 1986).  Although flight has been described

as the "consummate act of evasion," nervous or evasive behavior is also relevant suspicious conduct from which a juror could draw a reasonable inference of consciousness of guilt. See Illinois v. Wardlow, 528 U.S. 119, 124–25, 120 S. Ct. 673; 145 L. Ed. 2d 570 (2000) (discussing flight in the context of reasonable suspicion); Pinkey v. Keane, 737 F. Supp. 187, 197–98 (E.D.N.Y. 1990) (finding that evasive responses to police questions after the crime demonstrated consciousness of guilt).

Here, although it may not rise to the level of consciousness of guilt that flight represents, the jury had the right to consider evidence that Schlesinger acted in a suspicious manner when questioned about the fire by Fire Marshal Santangelo. After repeatedly delaying his interview with Fire Marshal Santangelo, the Defendant surreptitiously tape recorded the interview. His responses were described as evasive and accusatory. The Defendant denied involvement in Private Brands and stated that he only recalled one other fire in the building in 1991. Moreover, his description of his involvement in Goodmark Industries as a "Manager of Financial Operations" was misleading. In fact, the evidence showed that the Defendant and his brother owned and controlled every aspect of Goodmark Industries and Private Brands, and that there were three previous fires in the factory. The jury was entitled to infer consciousness of guilt from the facts surrounding the surreptitious recording, the evasive behavior, and the misleading statements.

The Defendant attempted to discredit the witnesses and present alternative explanations. However, the jury was entitled to credit the testimony of the Government's witnesses and experts. The Court "must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." <u>United States v. Daly</u>, 842 F.2d 1380, 1389 (2d Cir. 1988) (internal quotation marks omitted).

In sum, all of the evidence presented was more than sufficient, when taken together, to establish, beyond a reasonable doubt, that Schlesinger either participated in or aided and abetted in the arson involving the 1998 New Year's Eve Fire in his building in order to submit a fraudulent insurance claim.

## CONCLUSION

Having reviewed the submissions of the parties, it is hereby

**ORDERED**, that the Defendants' motion pursuant to Rule 29(c)(2) for a judgment of acquittal as to counts twenty and twenty-one is DENIED.

**SO ORDERED**

Dated: Central Islip, New York
June 8, 2005

_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge